# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ESTATE OF WILL R. JOHNSON, et al.,**

        **Plaintiffs,**

        v.                                     Case No. 10-C-953

**LA CAUSA INC., et al.,**

        **Defendants.**

## DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS

The facts alleged in the plaintiffs' complaint are as follows. Will R. Johnson was murdered by his mother, Arkisha Johnson, on October 26, 2007. (Docket No. 47, ¶6.) Will was 5-months-old. (Docket No. 47, ¶6.) Prior to his murder, Will had been removed from the care of his mother by the Bureau of Milwaukee Child Welfare ("BMCW") largely due to Arkisha's long history of mental illness which included "emotional instability, multiple psychiatric hospitalizations, multiple suicide attempts, threats to kill others, depression, anxiety and violent actions." (Docket No. 47, ¶¶19, 26.) La Causa, Inc. ("La Causa") and/or Professional Services Croup, Inc. ("PSG") managed Will's case as agents of the BMCW. (Docket No. 47, ¶¶10, 11, 17, 18.) The individually named defendants were involved in supervising Will's care as employees of the defendant corporations. (Docket No. 47, ¶¶12-14.) Will was placed in the care of his cousin, (Docket No. 47, ¶29), and a formal petition to adjudicate Will as a child in need of protection and services ("CHIPS") pursuant to Wis. Stat. § 48.13(1) was filed in Milwaukee County Circuit Court on July 3, 2007, (Docket No. 47, ¶30).

That court ordered the BMCW to provide Arkisha with unsupervised visits with Will on the condition that Arkisha comply with her prescribed mental health treatment and take her medication.

(Docket No. 47, ¶36.) Arkisha missed multiple scheduled visits, and at certain times child welfare officials knew or believed that Arkisha had not been taking her medication. (Docket No. 47, ¶¶35, 37, 39, 44). At a hearing on October 3, 2007, the court reminded Arkisha that she had to comply with her prescribed treatment to be able to have unsupervised visits with Will. (Docket No. 47, ¶46.) The court entered an order permitting the child welfare agencies to allow unsupervised visits between Arkisha and Will at the agencies' discretion. (Docket No. 47, ¶46.) Although Arkisha failed to take her medication as prescribed, Arkisha had unsupervised visits with Will on October 12, 2007, October 19, 2007, and October 26, 2007. (Docket No. 47, ¶¶52-53.)

On October 26, 2007, an employee of PSG picked Will up from his cousin's home and took him to Arkisha's home for an unsupervised visit. (Docket No. 47, ¶56.) The employee supervised Arkisha and Will for about half-an-hour and then left the residence, leaving Arkisha alone with Will. (Docket No. 47, ¶58.) Shortly after the employee left, Arkisha placed Will in a bathtub containing 8-10 inches of water and left him alone. (Docket No. 47, ¶59.) At some point later, Arkisha found Will floating in the bathtub, unresponsive. (Docket No. 47, ¶60.) Arkisha then took an overdose of her prescribed medications and contacted her social worker and indicated that something was wrong with Will. (Docket No. 47, ¶¶61-62.) Medical personnel were summoned but they were unable to revive Will. (Docket No. 47, ¶64.) Will was pronounced dead about an hour and twenty minutes after the child welfare employee left Will alone with Arkisha. (Docket No. 47, ¶¶58, 65.) An autopsy determined that Will had drowned. (Docket No. 47, ¶66.)

Shortly thereafter, Arkisha was charged with First Degree Intentional Homicide relating to the death of Will. (Docket No. 47, ¶67.) A year later, Arkisha pled guilty to a reduced charge of Second Degree Reckless Homicide, (Docket No. 47, ¶68), and was sentenced to 15 years in prison, (Docket No. 47, ¶69).

About three years following Will's death, Will's estate and his father initiated the present action on October 25, 2010, originally naming the State of Wisconsin, Milwaukee County, La Causa, Inc. ("La Causa"), Rebecca Hollister, Megan Danielson, Kathleen Walczak, and Wisconsin County Mutual Insurance Company, as defendants. (Docket No. 1.) The State of Wisconsin filed a motion to dismiss on November 17, 2010, and La Causa filed a motion to dismiss on November 19, 2010. (Docket Nos. 8, 12.) Shortly thereafter, the parties stipulated to the withdrawal of La Causa's motion, (Docket No. 13), and to the State of Wisconsin's dismissal as a defendant. (Docket Nos. 14, 15.) Similarly, on December 15, 2010, the parties stipulated to the dismissal of defendants Milwaukee County and its insurer. (Docket Nos. 21, 22.)

On March 11, 2011, La Causa, and two of their employees, Megan Danielson, and Hollister, (collectively "the La Causa defendants"), filed a motion to dismiss. (Docket No. 36.) Kathleen Walczak filed a similar motion to dismiss on March 30, 2011. (Docket No. 41.) The defendants subsequently withdrew their motions as part of a stipulation among the parties to permit the plaintiffs to file an amended complaint, (Docket Nos. 45, 46), which they did on April 19, 2011, (Docket No. 47.) In this amended complaint, the plaintiffs added Professional Services Group, Inc. ("PSG") as a defendant and clarified that Kathleen Walczak was an employee of PSG (collectively "the PSG defendants"). In this complaint, the plaintiffs seek relief pursuant to 28 U.S.C. § 1983 alleging that the defendants acted under color of state law to deprive Will of his constitutional rights. (Docket No. 47, ¶¶70-90.) Also included in the amended complaint is a state law claim of negligence. (Docket No. 41, ¶¶91-99.)

On May 9, 2011, both the La Causa defendants and the PSG defendants filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) alleging that the court lacked jurisdiction in this matter. (Docket Nos. 50, 52.) The plaintiffs have responded, (Docket No. 59), and the defendants have replied, (Docket No. 61, 62). The pleadings on these motions are closed and the matters are ready

3

for resolution. All parties have previously consented to the full jurisdiction of a magistrate judge. (Docket Nos. 2, 17, 26, 29, 34.)

**MOTIONS TO DISMISS**

**A. Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).**

The defendants argue that the plaintiffs have failed to adequately allege a federal cause of action and therefore this court lacks subject matter jurisdiction over this case. Although the defendants frame their motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the defendants are, in effect, arguing that this court lacks jurisdiction because the plaintiffs have failed to state a federal cause of action for which relief may be granted. Therefore, the motions are more properly motions to dismiss pursuant to Rule 12(b)(6).

> When both the subject matter jurisdiction of the federal court and the substantive claim for relief are based on a federal statute, dismissal for lack of subject matter jurisdiction is proper only when the allegations of the complaint are frivolous. Malak v. Associated Physicians, Inc., 784 F.2d 277, 279-80 (7th Cir. 1986); Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 602 (9th Cir. 1976); see also Bell v. Hood, 327 U.S. 678, 682 (1945) (finding substantial constitutional claim adequate to invoke federal subject matter jurisdiction). As Moore's Federal Practice explains:
>
>> If a federal statute upon which a claim is premised is interpreted to be inapplicable, it could be argued that the plaintiff has failed to present a federal question and thus subject matter jurisdiction is absent. However, the courts have uniformly held that in such instances the preferable practice is to assume that jurisdiction exists and proceed to determine the merits of the claim pursuant to [Rule 12(b)(6) or Rule 56].
>
> 2A James W. Moore et al., Moore's Federal Practice P 12.07[2.-1] (2d ed. 1994). Thus, if a plaintiff fails to properly allege a claim for relief brought under a federal statute, the case should be dismissed under Federal Rule of Civil Procedure 12(b)(6), rather than Rule 12(b)(1). Romero v. International Terminal Operating Co., 358 U.S. 354, 359 (1959) (finding the mere assertion of a substantial claim under a federal statute sufficient to permit a district court to assume jurisdiction and determine whether the statute does provide the claimed rights); Gonzalez v. Southern Pac. Transp. Co., 773 F.2d 637, 645 (5th Cir. 1985) (same).

Health Cost Controls v. Skinner, 44 F.3d 535, 537 (7th Cir. 1995).

Although the La Causa defendants contend that the distinction between 12(b)(1) and (b)(6) is immaterial, (Docket No. 61 at 4), a motion brought under 12(b)(1) is not analyzed in the same way as a motion under 12(b)(6) and these distinctions might affect the ultimate resolution of the motion. For example, depending upon which rule a motion is brought under, there are different consequences if the court considers facts outside the complaint. Compare Capitol Leasing Co. v. FDIC, 999 F.2d 188, 191 (7th Cir. 1993) (addressing motions under Rule 12(b)(1)) with Fed. R. Civ. P. 12(d) (addressing motions under Rule 12(b)(6) or 12(c)). Moreover, there are differences as to which party has the burden of proof. Compare United Phosphorus, Ltd. v. Angus Chem. Co., 322 F.3d 942, 946 (7th Cir. 2003 (holding that under Rule 12(b)(1) burden is upon party asserting jurisdiction), with Yeksigian v. Nappi, 900 F.2d 101, 104 (7th Cir. 1990) (holding that under Rule 12(b)(6) burden is upon defendant to prove complaint is insufficient).

More significantly, subscribing to the defendants' view of subject matter jurisdiction would dramatically reshape federal civil procedure. The present claim is not, for example, a divorce action or some other sort of claim which plainly does not fall within a federal court's limited jurisdiction. Instead, this is a claim alleging a violation of constitutional rights brought pursuant to 42 U.S.C. § 1983, which has become the basis for a significant percentage of federal cases.

Federal courts routinely exercise jurisdiction over a dispute based solely upon a single federal law claim such as a claim under 42 U.S.C. § 1983. See 28 U.S.C. § 1331. Like every other type of civil case, these disputes are often resolved by dispositive pretrial motions. If the court were to follow the defendants' conception of jurisdiction, no longer would a federal court be able to grant a defendant's motion for summary judgment on a claim that forms the basis for the court's jurisdiction. If a court lacks subject matter jurisdiction, it lacks the authority to grant a motion for summary judgment and to enter a judgment on the merits. See, e.g., Buchel-Ruegsegger v. Buchel, 576 F.3d 451, 455 (7th Cir. 2009). Rather, the approach advocated by the defendants in this case

would seem to suggest that instead of entering judgment in favor of the defendant, after determining that a plaintiff's claim must fail at the summary judgment stage, the court must instead generally dismiss the action pursuant to Rule 12(h)(3) for lack of subject matter jurisdiction. The result would be that, instead of a judgment on the merits, the court's order would have questionable preclusive effect.

Recognizing the vast number of cases in which courts enter judgments after concluding that a plaintiff's complaint is insufficient for failing to state a claim upon which relief can be granted, including the primary case upon which the defendants rely, see Deshaney, 489 U.S. at 193, suggests that the defendants' interpretation of subject matter jurisdiction is misplaced. Therefore, the court will construe the defendants' motions to dismiss for failure to state a claim under Rule 12(b)(6), rather than motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

In order to state a claim, a civil complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The Rule reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." Brooks v. Ross, 578 F.3d 574, 580 (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002)). Even for § 1983 claims there is no heightened pleading standard. McCormick v. City of Chicago, 230 F.3d 319, 323 (7th Cir. 2000) (citing Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993)).

Recently, the Supreme Court has addressed the question of just how short and plain that statement may be. See Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009); Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). The Seventh Circuit synthesized the recent holdings of the Court regarding the pleading standard set forth in Rule 8(a)(2) and stated:

> First, a plaintiff must provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.

Brooks, 578 F.3d at 581.

Although detailed factual allegations are not required, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 555).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Id. at 1949 (quoting Twombly, 550 U.S. at 556, 557, 570) (internal citations and quotation marks omitted). With these standards in mind, the court shall now turn to the specific allegations contained in the plaintiffs' complaint.

**B. Will's Right to Due Process**

The plaintiffs contend that the defendants acted under color of state law to deprive Will of his life and liberty and thus in violation of 14th Amendment right to substantive due process. (Docket No. 47, ¶79.) However, Will's death was directly caused not by a state actor but by his mother.

The 14th Amendment protects individuals *from* the state; it does not guarantee individuals protection *by* the state. DeShaney v. Winnebago County Dept. of Soc. Serv., 489 U.S. 189, 196 (1989). Therefore, ordinarily, a person injured by the wrongful conduct of a private individual does not have a claim against the state under § 1983. Id. at 197. "Negligence or even gross negligence

does not suffice to give rise to liability under § 1983." Lewis v. Anderson, 308 F.3d 768, 773 (7th Cir. 2002) (citing K.H. v. Morgan, 914 F.2d 846, 852 (7th Cir. 1990)).

Exceptions to this general rule can be found if the state assumed a special duty to protect the individual or if the state created the danger that resulted in the harm to the individual. DeShaney, 489 U.S. at 196; Lewis v. Anderson, 308 F.3d 768, 772 (7th Cir. 2002). The state establishes a special relationship with a child when it removes that child from the care of a parent. Jennifer Y. v. Velazquez, 434 F. Supp. 2d 570, 576 (N.D. Ill. 2006) (citing K.H., 914 F.2d at 852). Based upon this special relationship, a child removed from the care of parents has a constitutional right to not be placed into the care of abusive foster parents. Id. As for the state-created danger exception, a state may violate a child's 14th Amendment substantive due process rights if it "creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise would have been." Lewis, 308 F.3d at 773 (quoting Reed v. Gardner, 986 F.2d 1122, 1126 (7th Cir. 1993)). The plaintiffs contend that their complaint adequately alleges both theories of liability.

### C. Defendants as State Actors

The PSG defendants, and to a lesser degree the La Causa defendants, contend that the complaint fails to adequately allege that the defendants were state actors. (Docket No. 53 at 4.) This argument is not well developed in the defendants' briefs and therefore the court shall address this argument only briefly.

Non-governmental actors may be treated as government actors if "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (2001) (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974)) (quotation marks omitted). The Court has set forth several tests for lower courts to utilize when faced with the

task of determining whether the action of non-governmental actor might fall within the rubric of state action. These tests have been described "as the symbiotic relationship test, the state command and encouragement test, the joint participation doctrine[,] and the public function test." Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 823-24 (7th Cir. 2009) (footnotes omitted). Courts have frequently held that private entities that care for children in factual circumstances similar to those alleged in this case are state actors for the purposes of § 1983 pursuant to the "public function" test. See Allen v. Mattingly, 2011 U.S. Dist. LEXIS 34206, 57-58 (E.D.N.Y. Mar. 29, 2011) (citing cases).

The complaint alleges that the BMCW obtained custody of Will and entered into a contract with La Causa and/or PSG whereby these entities would manage Will's case and oversee his care while Will was in the custody of the BMCW. (Docket No. 47, ¶15, 27.) Based upon these allegations, the court concludes that the plaintiffs have adequately alleged that the defendants were state actors.

### D. Special Relationship

Accepting the factual allegations contained in the complaint as true, it is clear that the plaintiffs have adequately alleged that a special relationship was established between the defendants and Will. The BMCW intervened to remove Will from the custody of his mother and La Causa and/or PSG, as agents of BMCW, assumed the BMCW's care and case management responsibilities for Will. (See, e.g., Docket No. 47, ¶¶15, 27.) Numerous courts have held these actions are sufficient to establish the requisite special relationship. See Jennifer Y., 434 F. Supp. 2d at 576 (citing K.H., 914 F.2d at 849). However, the crux of the present dispute appears to rest upon the question of whether that special relationship had terminated at the time of Will's death. The establishment of a special relationship does not automatically result in a constitutional duty of lifelong protection. DeShaney, 489 U.S. at 201. Rather, the special relationship, and thus the duty to

9

safeguard children under state care, may terminate, for example when the state returns the child to the custody of a parent. Id.

There are generally speaking, two forms of custody: legal and physical. Under the Wisconsin Children's Code, these terms are defined as follows:

> "Legal custody" means a legal status created by the order of a court, which confers the right and duty to protect, train and discipline the child, and to provide food, shelter, legal services, education and ordinary medical and dental care, subject to the rights, duties and responsibilities of the guardian of the child and subject to any residual parental rights and responsibilities and the provisions of any court order.
>
> * * *
>
> "Physical custody" means actual custody of the person in the absence of a court order granting legal custody to the physical custodian.

Wis. Stat. § 48.02(12), (14).

Some courts have held that a state must have both legal and physical custody of an individual in order for there to be a special relationship. Briggs v. Oklahoma, 472 F. Supp. 2d 1294, 1301 (W.D. Okla. 2007) (citing A.S. v. Tellus, 22 F. Supp.2d 1217, 1221 (D. Kan. 1998); Wooten v. Campbell, 49 F.3d 696 (11th Cir. 1995); Clark v. City of Philadelphia, 2006 U.S. Dist. LEXIS 55241, 2006 WL 2321574 (E.D. Pa. August 8, 2006)); see also D.W. by M.J. v. Rogers, 113 F.3d 1214, 1218-19 (11th Cir. 1997). For example, in Wooten, the state, with the consent of the parents, obtained legal custody of the child. 49 F.3d at 698. The state placed the child into the care of his mother and the state's role was limited to arranging court-ordered visitation with the child's non-custodial father. Id. at 698, 699. During one of these unsupervised visits, the father abducted the child, eventually murdering him. Id. at 698. The Eleventh Circuit concluded that the state's role in this case was distinct from a situation where the state controls both the legal and physical custody of a child by, for example, placing a child into foster care. Id. at 699-701. Although the state had legal custody, the court concluded that there was no special relationship because the mother retained physical custody. Id.

Relying largely upon <u>Wooten</u>, the defendants contend that while the state actors had legal custody of Will, under Wisconsin law, <u>see</u> Wis. Stat. § 48.02(14), it was his mother who had physical custody at the time of his death and therefore no special relationship existed.

In addition to not being controlling upon this court, <u>Wooten</u> is factually distinguishable. In the present case, Will was not living fulltime with his mother, as was the child in Wooten. Rather, the complaint indicates that Will resided with a person chosen by the state under circumstances akin to a foster care arrangement. Will was with his mother only for the limited purpose of a visit that was scheduled to last only a few hours. Moreover, although using the same words, it appears that definitions of physical and legal custody at issue in <u>Wooten</u> are very different from those used in the Wisconsin Children's Code. For example, Wis. Stat. § 48.207(1) states that "[a] child held in physical custody" by the state may be held in "the home of a parent or guardian." This provision seems to suggest that a child could still be in the "physical custody" of the state while living fulltime in a parent's home, which is notably distinct from the conclusion that formed the basis for the holding in <u>Wooten</u>.

Instead of placing undue emphasis upon the labels utilized to describe the nature of the relationships between relevant parties, the court must remain cognizant of the fact that the ultimate question is not whether the state had physical and/or legal custody of the child but rather whether a special relationship existed between the state actors and Will. Although the nature of the relationship, including whether the state had physical and/or legal custody of Will at the time of his death will likely be relevant factors in this analysis, these determinations should not be dispositive of the ultimate question. Determining whether a special relationship exists may require a fact-intensive inquiry and might ultimately be a question for the finder of fact at trial. At this preliminary stage, this court's task is not to decide whether a special relationship actually existed but rather determine whether the facts set forth in the complaint present a plausible cause of action. It is the

conclusion of this court when a state actor assumes care for a child, a special relationship may plausibly exist and persist even when the state places the child with his mother for a few hours of unsupervised visitation.

### E. State-Created Danger

"[I]f the state puts a man in a position of danger from private persons and then fails to protect him . . . it is as much an active tortfeasor as if it had thrown him into a snake pit." Witkowski v. Milwaukee County, 480 F.3d 511, 513 (7th Cir. 2007) (quoting Bowers v. De Vito, 686 F.2d 616, 618 (7th Cir. 1982)). This notion has come to be referred to as the "state-created danger" exception and is the second exception to the general principle that state actors owe no duty to protect individuals against the tortious conduct of private persons. Id.; Monfils v. Taylor, 165 F.3d 511, 516 (7th Cir. 1998).

Although "there is considerable variation among the circuits in their application of the state-created danger doctrine," these differences do not appear doctrinal and instead amount to alternative means of articulating the same general principles. King v. E. St. Louis Sch. Dist., 189, 496 F.3d 812, 818 n.3 (7th Cir. 2007) (citing Pena v. Deprisco, 432 F.3d 98, 108 (2d Cir. 2005)). The Seventh Circuit has articulated three elements to a state-created danger claim: (1) the state actor affirmatively creates or increases a danger faced by the individual; (2) the state actor's failure to protect the individual from this danger is the proximate cause of the individual's injury; and (3) the state actor's failure to protect the individual shocks the conscience. Id. at 818 (citing cases). "[T]he key question in determining whether state behavior violated the victim's constitutional rights is: 'What actions did [the state actor] affirmatively take, and what dangers would [the victim] otherwise have faced?'" Windle v. City of Marion, 321 F.3d 658, 661 (7th Cir. 2003) (quoting Monfils, 165 F.3d 511).

Even when the state is aware of a pre-existing danger, the state does not create a danger by returning to the status quo that existed before it intervened. DeShaney, 489 U.S. at 201. The defendants contend that this is what happened here; the state actors returned Will to his mother, which is precisely the arrangement that would have existed had the state never intervened.

However, the complaint does not allege that the state actors returned Will to his mother fulltime, thus restoring the status quo. Rather, the complaint alleges that they permitted Arkisha to have a brief visit with her son. Although either scenario involves Will being placed in the care of his mother, the significance of the distinction between a brief visit and a permanent return of custody is illustrated by the facts alleged in the complaint. The complaint alleges that Arkisha was despondent and hopeless because she feared she would never regain custody of Will and expressed the view that if she could not have Will, then no one could. (Docket No. 47, ¶48.) Based upon these alleged facts, it is reasonable to infer that a temporary visit posed a particular heightened danger to Will that was distinct from any danger Will would have faced had he been permanently returned to Arkisha. Placing Will into this danger could plausibly amount to a violation of Will's substantive due process rights, and therefore the court concludes that the plaintiffs have also stated a substantive due process claim based upon the state-created danger theory of liability.

**F. Monell Claim**

Finally, the PSG defendants contend that the plaintiffs have failed to adequately allege a liability under Monell, see Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978). (Docket No. 62 at 10-12.) The defendants did not raise this argument in their initial briefs. The first time that the PSG defendants argued that the complaint failed to set forth a Monell cause of action was in their reply. If the moving party raises an issue for the first time in its reply, the party has waived that particular issue or argument. While the plaintiffs did mention their Monell claim in their response, it was only within the context of noting the various claims presented in their

amended complaint. Therefore, the defendants are not replying to an argument raised by the plaintiffs' response. By failing to affirmatively raise this argument in their initial brief, the defendants have waived their challenge to the plaintiffs' Monell claim for purposes of the motion to dismiss. Therefore the court shall not consider whether the plaintiffs have failed to adequately allege a cause of action under Monell.

**CONCLUSION**

Although brought under Federal Rule of Civil Procedure 12(b)(1), the court construes these motions as coming under Rule 12(b)(6) for failure to state a claim. The complaint adequately alleges that all defendants were state actors. Although the due process clause ordinarily does not impose a duty upon the state to protect individuals from private actors, the plaintiffs have adequately pled the two exceptions to this general rule. For Rule 12(b)(6) purposes, when the BMCW and its agents, the defendants, assumed custody of Will, a special relationship was established. This special relationship did not necessarily end during a brief visit between Will and his mother. The complaint also adequately alleges that the danger Will faced was state-created. It is plausible that allowing Arkisha to have a brief unsupervised visit with Will did not place Will back into the same situation he would have been had the state never intervened and instead placed him into a uniquely dangerous situation. Therefore, the defendants' motions to dismiss shall be denied.

**IT IS THEREFORE ORDERED** that the defendants' LaCausa and PSG's motions to dismiss, (Docket Nos. 50, 52), are **denied**.

The Scheduling Order (Docket No. 64) shall remain in effect with the following correction: the parties shall make their Rule 26(a) initial disclosures no later than **July 1, 2011.**

Dated at Milwaukee, Wisconsin this 24th day of June, 2011.

s/AARON E. GOODSTEIN  
U.S. Magistrate Judge